about a five minute recess. For this morning, Consolino against Towne. Mr. Cooper. Good morning, Justices. My name is Christopher Cooper. I represent Plaintiff Consolino. I want to bring to the Court's attention that Plaintiff Consolino is here, he's behind me, sitting in the uniform. I understand and I know that oftentimes plaintiffs come to you and they complain that the Court has not looked at the evidence in the light, most favorable standard. That is, looking at the non-movements testimony in the light, most favorable standard. But I think in this case, unlike in other cases, the Court really got it wrong and the Court really didn't take the time to look at the evidence. What is the plaintiff's best evidence that any of the defendants knew that Consolino testified on behalf of his wife at the Shackman hearing? Where in the record will we find this evidence? Because as far as I could tell from the briefs, there's an awful lot of conjecture to prove what is the absolutely critical point. Justice Rovner, I agree that my client is unable to say when he spoke with Sheriff Dart, I testified on my wife's behalf. That never happened. Rather, defendant Egan, as the compliance officer, the person who is responsible for overseeing Shackman processes, overseeing Shackman arbitration, that Egan in that position would at some point consult with the second in command, Mr. Towne, and of course the Sheriff. I realize that there isn't any place in the record where my client is able to say I went to Sheriff Dart and I looked Sheriff Dart in the face and I said, hey, I testified on behalf of my wife. But you know, Shackman complaints, for better or for worse, are not an unusual event in Chicago. There are quite a few each year. So why do we think that this would bubble all the way up to Sheriff Dart's level, or for that matter, even Mr. Egan's level? There are Shackman hearings, people testify, there's a process, I hope they get resolved. Your Honor, plaintiff takes a different position. Plaintiff takes a position that when an employee alleges a violation of Shackman, that it is something that the Chief of Staff would know, that it is something that the Sheriff would know. And that the whole purpose of having Mr. Egan in this position, in other words, giving Mr. Egan this duty of overseeing the Shackman process represents to the Sheriff's Department that this is a big deal, that this is something that the Sheriff would be aware of. But it wasn't even Officer Consolino's complaint, it was his wife. Are you saying that there's evidence in the record that shows that Egan delves into the witness lists for all Shackman proceedings? There is not evidence in the record that he delves. However, I would assume that as the compliance officer, if he's aware of a Shackman proceeding, that he would at least take a cursory look, that he would have some sense of the complaint, the nature of the complaint, the basis of the complaint, and that one of the witnesses is a high-ranking commander. It's Commander Consolino. These are all unfounded assumptions. There isn't any evidence to support them. Judge, I hear you. I hear you loud and clear. But I think, in my opinion, in my client's opinion, it's logical to assume that the Sheriff and his second-in-command and his ass on behalf of his wife in a Shackman hearing. But that's not even in front of a jury. I'm sorry, Judge. Judge Rollins, yes? Assumptions are not evidence? I'm with you. All right. Justice Rovner, I can... I was going to say the same exact thing. The minute we start making law on the basis of assumptions, that'll be the end of our system, to be perfectly blunt. I hear you. If I may... And the other problem, it's not that either the Sheriff or Mr. Egan has nothing to do but monitor the Shackman process. This is a huge department in Cook County, and these are people with a lot of responsibilities, which really just sort of drills in that if we had some evidence that there were interventions by these people, that would be one thing. But without any evidence, I don't think we can make that assumption. But, Judge, we have circumstantial evidence that things happened. No, we don't. We have circumstantial evidence of two things. We know that Officer Consolino was not, in fact, detailed to the FBI. Correct. And we know that there was no other part of the jail. And by themselves, those are things that a lot of people could say about themselves. And maybe a lot of people were interested in being detailed to the FBI, and they weren't detailed either. And the move to a different section, which as far as I can tell, the record does not tell me that this was less favorable from the point of view of salary or anything. Maybe people liked the boot camp better. I'll go with that. That's what the record shows. But they had staffing needs in 11. I understand. But, Judge, you also have a person qualified to be detailed to the FBI. Well, that's your assumption. But how do we do this? I mean, we say in all these employment cases, we're not the super I'm not sure that somebody saying I'm qualified for this job in the employment context is ever taken to be conclusive that you're qualified or even enough to raise an issue of fact. He was not in the law enforcement side of things. He was in the correctional officer side of things. I realize he has other qualifications. He has his background in the Marines. He has a particular process for bringing his name forward to the FBI. Your Honor, I respectfully disagree. As Agent Christie testified, in some cases the FBI goes out and finds people. In this case, Christie knew Consolano from having served with Consolano in the military. It was clear from Agent Kipe's testimony that Commander Consolano was sought because of his top secret clearance. It would make it easier for him to come to the FBI. As S.A. Hannon makes very, very clear in her report, there is not a protocol. The county puts an emphasis on this nonexistent protocol. And that's where I sense, Your Honor, may have a sense that he went outside of protocol, but there isn't protocol. And S.A. Hannon makes it clear that there isn't protocol. The FBI wanted Consolano. But they back off when they're told that there's a problem with the detail. Your Honor, I don't see it that way. I don't see the FBI backing off. I think there's a lack of clarity as to what happened in the end. It's as if everything just went silent. No one really knows what happened. Each of the agents who testified, testified that they were looking forward to working with Consolano. That Consolano was, in fact, qualified to work with them. So this is all circumstantial evidence. I understand. No, when somebody has one of these details, the Sheriff's Office is still paying that person's That is correct, Your Honor. And so the Sheriff's Office indicates, I know I read this someplace in the briefs, that they need to feel that there's going to be some benefit to them for the detail, not just that the detail is something that the individual, him or herself, would like. I agree. Which is why from the law enforcement side, having somebody go and work a couple of years with the FBI might really develop skills and maybe less so, even though we can assume the FBI would have loved to have had Commander Consolano. But it's a two-way street, right? Your Honor, I do believe the record shows that even on the correctional side, Consolano could have gone from the FBI to a counterintelligence unit. And I think that's clear from the record. And what I'm saying is that the county... As a correctional officer still, or are you assuming that he would have given a different job at the Sheriff's Office when he came back? He would have a different job, and he would be qualified for a position in the counterintelligence office, even as a correctional officer. The county has been unable to provide an answer as to why Commander Consolano was not permitted to go to the FBI. And I understand... Why is that their burden? I mean, there needs to be some evidence to show that it was an impermissible reason. But in general, they can decide either to send somebody or not to send somebody, or to send somebody different. It's not like you have a right to go on I understand, Your Honor, but considering that there were depositions, many people sat for depositions, there was a great deal of discovery, we know that the Sheriff's Department simply didn't do things this time the way that things would typically be done. And that is, here's a qualified person, the FBI wants him, and... Do we know that this position was filled, ultimately, the FBI detail? I don't recall, Your Honor. But if I may just finish, Your Honor, and then he testifies in January at his wife's arbitration. And then thereafter, the FBI sends a request from Mr. Consolano, which under ordinary circumstances would be accepted because of his past experience, especially his top secret clearance, but suddenly the offer is withdrawn, no explanation, Mr. Consolano waits around perhaps a year and a half, S.A. Hannon does an investigation, she concludes there isn't a protocol, the county's position is he violated the protocol, and that's why he never got to the FBI. And there just isn't evidence that he violated protocol. Okay, I mean, if you want to save a second for rebuttal, I'm going to advise you to do that. Yeah, I can do that. Thank you. All right, thank you. Mr. Patterson. Good morning, Your Honor. May it please the Court. As counsel for Mr. Consolano just stated, there was a full workup of discovery in this case, over a year's worth, at the conclusion of which the plaintiff submitted 1,135 pages of discovery to the district court. After reviewing those 1,000 plus pages, the district court concluded, correctly in our opinion, that there is no evidence that the defendants either knew about the Shackman arbitration or that Mr. Consolano had testified in the Shackman arbitration, nor is there any evidence that any of the defendants were personally involved in either denying him his detail to the FBI or involved in his transfer from the boot He did, Your Honor. And let me address that head-on, because I think that one of Mr. Consolano's arguments, as he just repeated here, is a timing argument. And as this Court has said time and again, that where timing or even suspicious timing is simply not enough to get past summary judgment. In particular, in the Hall case, this Court said that if you're going to rely on a timing argument, the alleged retaliatory actions have to be within days or weeks of the protected speech. Here he testified January 6th of 2012. The earliest that the record can seem to identify is that the FBI detail matter was dropped sometime in May or June of 2012. With respect to several months later. So in April, early April, the record shows that Consolano asks the sheriff about the status of his request to join the task force. And I think at that point the sheriff says, I have no chance to complete paperwork or something like that. Go ask someone. That's correct, Your Honor. The sheriff responded that Mr. Consolano should have his supervisor, Harrington, reach out to the sheriff. And the record is clear that for whatever reason, Mr. Harrington never did that. And by early May, Egan tells Consolano that the FBI has rescinded an offer. So I guess at some point there's word that there is willingness on the FBI's part to have Mr. Consolano, but it's rescinded. And then he finds out it's not rescinded. But there's conversation about it going on during May. That's correct, Your Honor. The sequence of events appears to be that a Mr. Ways, who used to work at the FBI, was then employed by the sheriff. Mr. Egan reached out to Mr. Ways and asked him to contact the FBI. Mr. Ways did that, spoke with Assistant Special Agent in Charge Pagan. They had a conversation. Ways and Pagan had a conversation that was essentially that the procedure for identifying someone and potentially detailing someone to the FBI was not followed. Furthermore, Mr. Pagan learned that Mr. Consolano was a correctional officer, not a police officer. So he took away from the conversation that Mr. Pagan was rescinding the request. He conveyed that to Mr. Egan, who then conveyed it to Mr. Towne. All of that occurred roughly in late May. Can I ask you just a factual question about Mr. Egan? His scope of responsibility is what? What would you describe it as? He is the compliance officer for the sheriff's office. What does that mean? Compliance with what? In his deposition, he says that he is responsible for making sure that moves around the jail, other personnel decisions comply with Shackman and also comply with the employment man. Those are his two areas of responsibility. So it's not just Shackman? No, it's not just Shackman. All of the regulations that pertain to the sheriff's office. That's correct. What's important here, I think, for the court, and I would direct the court's attention to the McGrill versus the Village of Orland Park case. That is 850 F 3rd 308 decided in March of this year. That case is very, very recent case at Barr. In McGrill, it was a First Amendment retaliation claim. A police officer in Orland Park claims that he attended a public meeting, a county board meeting, made some statements that he believes angered his superiors and that they eventually retaliated against him by terminating him. What's interesting is the parallels. The district court ultimately concluded that there was no evidence that any of the defendants that Mr. McGrill sued even knew that he had testified at that hearing. And that's very similar to the case at Barr where each of the defendants denies knowing about the Shackman hearing or Mr. Consolino's testimony. And as the court was questioning my colleague, there is no evidence in the record that they did know. Similarly, Mr. McGrill relies on his sort of a must-have-known argument just as a plaintiff does here. So rather than evidence, he provides speculation and conjecture that somehow because, and he even admits in his deposition, Mr. Consolino does, that simply because the sheriff is the sheriff, simply because Mr. Egan is the compliance officer, and simply because Mr. Towne is the chief of staff, they must have known. And as the Mr. Towne, the person who ordered Consolino's transfer to Division 11, who did that? He is not, Your Honor. And in fact, all three defendants They all deny it, but it happened. Yes. And in fact, Mr. Consolino admits in his deposition that is the director, so each division has a director, and Mr. Consolino admits in his deposition that it's the directors who conduct the movements of commanders around the jail. So this would be the director of the boot camp and the director of 11? Correct. And they sat down, or at least we're supposed to infer that they sat down and said, let's shift, I guess there are two people who shift out of the boot camp about the same time, right? Well, there were actually five transfers in total on the same day, Your Honor, two of whom, one was Mr. Consolino and Commander Chubb, who was also at the boot camp. And so the directors had a meeting and the directors decided operationally that these moves would occur. That's what the record reflects. And so then you're left with just a pure timing argument, and again as this Court has said, timing arguments normally will not get you past summary judgment. And Judge Wood, you asked about the OPR, the Office of Professional Review complaint was made in July of 2012. The transfer occurred 15 months later in October of 2013. Similarly, there was a complaint made with the Office of Inspector General in March of 2013, and again the move occurred seven months later. So based on McGrill and based on Hull, that timing is not mere days or weeks, and therefore should carry no weight in this Court, just as it carried no weight in the District Court. So were those two... Thank you. Mr. Patterson, there's some argument in the briefs about whether an assignment to the FBI would be a detail that would be covered by the employment plan or some other kind of assignment. And it appears that a detail which lasts 90 days or less has to be approved by the sheriff. So if that's so, a two-year assignment to the FBI, which is paid for by the sheriff's office, couldn't a reasonable jury infer that if the sheriff is involved in approving 90-day details, that the sheriff would also be involved in approving two-year assignments to the FBI? No, Your Honor. I don't think a reasonable jury could make that conclusion, could reach that conclusion, or that would be a reasonable inference. The detailing out to the FBI, as stated in Mr. Ruel's declaration, does not necessarily occur at the level of the sheriff. And so I think what we have here is a situation where clearly the plaintiff wanted this detail, but it is also clear that in light of the procedures whereby it is typical one, that the office usually puts forward a person after doing a cost-benefit analysis. And I think what happened here is it is undisputed in the record that Mr. Consolino is a person who works at the boot camp. And so I don't think it would be a reasonable inference that the sheriff himself was personally involved in this decision because Mr. Consolino was so far removed from who we would typically send that it wouldn't be reasonable to have Mr. Egan in this situation. So unless there are additional questions for me, I will just simply ask the court respectfully to affirm the district court's granting of summary judgment. Thank you. Anything further, Mr. Cooper? I'm guessing that's a yes. Yes, a few minutes. So CCSO, the acronym for the Sheriff's Department. The Sheriff's Department has a set of orders referred to as SEEM. So 7J1 says that the only person who can decide whether or not someone goes to an external government agency is Sheriff Darden. Not the Sheriff's Department. Is it broad, or is that the one that's It begins with the 90-day detail, but then you have to go to C2, and C2 explains that if a detail is in excess of 90 days, that there's a procedure that has to be followed. And then that implicates duties for the compliance officer. So the sheriff is the only person, the only person who could have approved the detail. But what about Mr. Patterson's argument that it never got that far along? That the sheriff isn't going to be involved in every step of the way? It had to. This is the FBI. This is the FBI going to the Sheriff's Department. The Sheriff's Department is not a police department. I mean, it has a small contingent. But it's not like the Chicago Police Department where there's this constant working relationship. Sheriff Darden should be proud and happy that the FBI thinks that the Cook County Sheriff's Department should be able to work alongside the FBI. There was only one sheriff, one sheriff who was detailed. And I'm not sure there was someone before him. I don't believe there was a great history of sheriff's deputies being detailed to the FBI. This is a big deal. This is Sheriff Dart's moment. He gets to say he has one of his officers working in the FBI. I think my colleague meant to say Mr. Ways, and I think he said Mr. Wells. And I just wanted to make the record clear on that. Mr. Ways, his declaration speaks to what he believes is the process for a detail. And speaks to what he believes is the process if the details are outside of 90 days. But I call the court's attention to what has been marked as Plaintiff's Exhibits 50 and 51, Docket 87, which show Rule 7J1, as well as there's a reference to C2, Rules C2 in the defendant's response brief, which essentially corroborates my point as to the compliance officer's duties. Last and final, I understand that timing can't always get me to first base or even get me a home run. But I hope that the court will reverse the district court's decision. And I want to thank you for having me. Judge Robert, thank you for having me. Thank you very much. Thanks to both counsel. We'll take the case under advisement. Thank you.